Wanamaker, J.,
dissenting. In the briefs and oral arguments in open court it was clearly conceded upon all hands that there was one leading question in this case, which in substance is:
The Major Question. When the legislature enacts a statute as an “emergency law,” and therein provides that it shall go into “immediate effect,” and hence not be subject to the referendum, is such legislative judgment a finality, or may it be reviewed by the court? In short, Is the constitutional limitation on the legislature in the enactment of emergency laws subject to the same judicial review as are all other constitutional limitations upon legislative acts?
*650 In 1915 this court held in the Miami Conservancy case, 92 Ohio St., 215, in the last paragraph of the syllabus, as follows:
“11. The judgment of the general assembly as to the emergency character of an act under the constitutional amendment of 1912 is not conclusive, but its judgment in -that behalf may be challenged in a proper proceeding at any time within the ninety-day limit, either as to the constitutional vote or the emergency character of the act.”
The following judges concurred: Nichols, C. J., Donahue, Newman, Jones, Johnson, Matthias and Wanamaker, JJ.
As clearly showing the care with which this syllabus was considered, each and every paragraph, eleven in all, the following note appears at the end of the record of that case:
“Johnson, Jones and Matthias, JJ., dissent from paragraph 4 of the syllabus.”
But there was no dissent from paragraph 11.
Five of the judges of the supreme court are still agreed that the determination of this question is within the jurisdiction of the supreme court of Ohio — that the question is not solely legislative, but judicial, exactly the same as when any other constitutional limitation upon the legislature is involved.
Since the days of John Marshall this doctrine has become a part of our American jurisprudence, state and national. It is no longer questioned. The Oregon case to the effect that the question is purely legislative, cited to sustain the view of the minority judges, Jones and Matthias, has no application in *651 Ohio, where in half a dozen respects the constitutional provisions are essentially and radically different. The Oregon decision is a mere “Thus saith the court.”
True, in principle, the referendum is the same everywhere, if it be a referendum. The provisions, however, are what the respective constitutions make them, and it is the constitutional provisions that control the legislature and the courts, and not the principle merely. It would seem sufficient to say that the word “emergency” is nowhere in the Oregon Constitution. It twice appears in the Ohio Constitution, in a separate section dealing especially with “emergency laws” as “emergency laws.”
The Constitution of Ohio, as amended in 1912, wisely provided that “The decisions in all cases in the supreme court shall be reported, together with the reasons therefor.” Prior to that time the majority of the cases, often the big and most embarrassing ones, were decided without any opinion, or without any “reasons therefor.” The people of Ohio realized that the best test of reasonable judgments was sound “reasons therefor.” The majority in this case have undertaken to give “reasons” for this decision in the somewhat unusual form of a per curiam.
I want now to legally inspect and logically analyze these “reasons therefor,” as they appear in the opinion.
The first section of the opinion undertakes to justify the two judges, Jones and Matthias, for holding that this is a legislative question and not a judicial question, though five of the judges agree *652 that it is a judicial question. This first section of the opinion is therefore wholly foreign and entirely irrelevant to the merits of this case or in support of the judgment, which is based upon the proposition that it is a judicial question. It is self-evident that the exploitation of any theory by a minority cannot reasonably support the theory of a majority, which is necessary for any decision. I may therefore dismiss the first section, dealing with the nature of the question, whether legislative or judicial, as simply a case of padding this opinion with matter wholly unrelated to the decision, and as representing the minority view of only two judges, both of whom held in the Miami Conservancy case the exact contrary of what they hold now. It may be said, however, in passing, that the Miami Conservancy case did not present the exact question as to the “reasons for the necessity” that is presented here. Admitted. It did present, however, the question of constitutional sufficiency of the vote; that is conceded to be a constitutional limitation in the same section of the constitution as the “reasons for necessity” appear, both being constitutional limitations. If one is subject to judicial review, the other must be subject to judicial review.
The second section of the majority opinion deals with the so-called constitutional question. It emphasizes again and again the proposition that every legislative act is presumed to be constitutional, and that before such legislative act can be held unconstitutional the conflict must be clear and convincing, even beyond a reasonable doubt. Many authorities are cited. These citations and repetitions of *653 this old elementary proposition that has scarcely been disputed for a century or more are likewise entirely foreign and irrelevant to the question involved in this case.
The majority have devoted much labor and space to arguing a perfectly obvious proposition as to the presumption of the validity of the statute, and the degree of conflict necessary to invalidate a statute as unconstitutional. It has absolutely no relevancy here. It is not even referred to in the seventy-four pages of briefs of the defendants in error, who have covered every possible and even remote phase of this case. We of the minority do not claim there is any conflict .between the provisions of the act, known as the “Administrative Code,” and the constitution. That is-not here for review, and no question in this behalf was raised in the briefs or arguments. The only question here is as to when this act, presumed tq.be legal, presumed to be constitutional, is to go into effect.
The constitution announces the general policy that legislative acts shall not go into effect for ninety days, and then in a separate section, Id, Article II, makes three exceptions: 1. Tax levies. 2. Appropriations. 3. Emergency laws necessary for the immediate preservation of the public peace, health and safety.
The major part of this Section Id is then devoted to limitations upon the legislature as to such emergency act, in order to withdraw it from the right of referendum and give it “immediate effect.” The legislature declares in the Administrative Code that this act' shall go into immediate effect. It was *654 passed April 26th. And while there is an express declaration in the act that it shall go into immediate effect, the whole act shows that it was not intended to go into effect until July 1st, two' months and five days after it was passed.
We here have a clear admission that for two months and five days there was no emergency, in the judgment of the legislature, that was to be met by this act, but that there would be an emergency for the remaining twenty-five days before the ninety-day period of the constitution would expire. Amazing, isn’t it?
This Section 5, the emergency clause, is not a part of the legislative act, as that term is generally used. It is like a schedule to the act, in order to withdraw it from the constitutional provision relating to the ninety-day limitation. It is like a schedule to a Constitutional Amendment providing when that amendment shall go into effect, but otherwise bearing no relation to the meaning, terms or scope of the amendment.
I contend that this is the only common sense, consistent view of it, and that all these quoted authorities, however respectable on matters relevant, are absolutely without any relevancy here. My brethren of the majority have simply erected a smokescreen, quoting authorities that have no more relevancy to the question at issue than the Rule in Shelley’s Case, or the parable of the Good Samaritan.
But it might be put in another form.
Under the constitution the denial of the right of the people to approve or reject this Administrative *655 Code is as vital to the making of a valid legislative act as if either the house or the senate were denied the right to approve or reject the legislative act. Certainly the master’s rights under the constitution should have consideration equal to that given the rights of the master’s servants, the members of the general assembly.
I come now to consider the third section of the opinion, which deals with the only question, and the only matter really involved in this case, and that is, Have we here an emergency law, necessary to go into effect July 1, twenty-five days before the expiration of the ninety-day period, by reason of an emergency in fact, in order to immediately preserve the public peace, health and safety, which has been suddenly and unexpectedly threatened or imperiled ?
I come now to critically and candidly examine the last part of the opinion above referred to, dealing with the “emergency.”
In the last two or three pages, devoted to a discussion of this phase of the case, the word “emergency” is nowhere defined.
Some words are so common, so usual, so familiar, in our everyday life that they need no definition; but not so with the word “emergency,” as will appear from the definition.
I want here to pause a moment to express my gratitude to the majority for having quoted me at such length in the City of Xenia case, supra. I want to declare my appreciation, not alone in words. I shall endeavor to demonstrate it by works in this very case. I shall use it as a precedent for refer *656 ence to the opinions of the majority Judges, which I trust shall be somewhat more relevant and appropriate to the issue here involved than the reference made to my opinion in the City of Xenia case.
In a comparatively recent case, decided in 1916, State, ex rel. Menning, v. Zangerle, Auditor, 95 Ohio St., 1, the following Judges concurred: Johnson, Wanamaker, Newman, Jones and Matthias. Judge Matthias wrote the opinion of the court. The question related to an emergency under Section 5649-4, General Code.
In order that I shall do no injustice to the Judges who concurred in this judgment, and the Judge who wrote the opinion, let me quote at some length.
Section 5649-4, General Code, so far as pertinent, reads: “For the emergencies mentioned in sections * * * seventy-four hundred and nineteen * * * the taxing authorities of any district may levy a tax sufficient to provide therefor irrespective of any of the limitations of this act.”
What were the terms and conditions in Section 7419 to which the word “emergencies” relates ?
That section, so far as pertinent, reads:
“When one or more of the principal highways of a'county, or part thereof, have been [1] destroyed or damaged by freshet, landslide, wear of watercourses, or other casualty, or, [2] by reason of the large amount of traffic thereon or from neglect or inattention to the repair thereof, have become unfit for travel or cause difficulty, danger or delay to teams passing thereon, and the commissioners of such county are satisfied that the ordinary levies *657 authorized by law for such purposes will be inadequate to provide money necessary to repair such damages or to remove obstructions from, or to make the changes or repairs in, such road or roads as are rendered necessary from the causes herein enumerated, they may annually thereafter levy a tax at their June session,” etc.
The question was as to whether or not all the highways that had become out of repair and unfit for travel, mentioned in Section 7419, were included within the word “emergencies” in Section 5649-4.
Therefore the first question to be determined was, What is an emergency? And Judge Matthias proceeded to answer that question in the opinion, page 8, as follows:
“The word ‘emergency’ as used in this statute is to be taken in its natural, plain, obvious and ordinary signification. The Century Dictionary defines it as follows:
“(1) ‘A sudden or unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances.’
“(2) ‘A sudden or unexpected occasion for action; exigency; pressing necessity.’ ”
It may be that the excessive modesty of the majority, or of one of its concurring members, forbade the use of this quotation. But it would seem that at least something should have been said about the scope and meaning of “emergency” as approved by standard dictionaries, or by courts in similar ad *658 judicated cases, especially our own court and in a recent case.
Now, apply this definition as Judge Matthias applied it. I again quote, page 8:
“Roads requiring reconstruction or repair are of two general classes, the first embracing those roads which have been destroyed or damaged by freshet, landslide, wear of watercourses, or other casualty, any one of which conditions comes within the term ‘emergency’ as above defined; the second, those roads which by reason of the large amount of traffic thereon or from neglect or inattention to the repair thereof have become unfit for travel or cause difficulty, danger or delay to teams passing thereon. It seems quite probable that the legislature must have had this classification in mind when in Section 5649-4 it used the term ‘emergencies.’ The condition occasioned in a manner stated in our first classification constitutes an ‘emergency.’ It is the result of a sudden or unexpected happening, an unforeseen occurrence, an extraordinary condition; while a condition arising under our second classification has to do only with injuries resulting naturally and necessarily from the use of the roads, or from mere neglect or inattention of the county commissioners, which could readily have been foreseen and cared for by the usual and ordinary methods. The one condition is extraordinary and unforeseen, the other natural, usual, and to be expected. The one class constitutes an emergency, the other certainly does not.”
Later on in the opinion, at page 10, Judge Matthias continues:
*659 “The word ‘emergencies’ thus used would mean a sudden or unexpected happening or unforeseen occurrence or condition and would also mean a condition gradually created, and therefore expected and foreseen by those whose very neglect and inattention had caused it. This absurd conclusion is necessarily reached by the adoption of the theory that all of the purposes mentioned in Section 7419 are emergencies.”
If it was absurd then, is it any less absurd now?
This doctrine, announced in the opinion by Judge Matthias, was carried into the syllabus of that case, as follows:
“3. Exemption from the restriction fixed by such law applies only in favor of levies required to meet extraordinary conditions resulting from some unexpected or unforeseen occurrence or circumstance, such as the destruction ’of or damage to a principal highway by freshet, landslide, wear of watercourses or other casualty.
“4. Neglect or inattention of public officers to repair highways does not constitute an emergency, and a levy of taxes for the purpose of meeting the expense of reconstruction, repair and maintenance of roads which, by reason of such neglect and inattention, or by reason of a large amount of traffic thereon, have become gradually worn out and unfit for travel, even though they cause difficulty, danger or delay, is not exempt as an emergency levy.”
Concurring in this syllabus were Judges Johnson, Wanamaker, Newman and Jones.
In the Zangerle case, then, this definition and doctrine as to an emergency is held to apply, with *660 strict construction, to the exceptions made to the Smith one-per-cent, law, — that is, emergencies under Section 7419, General Code, — and so applying the definition to such exceptions to the general statutory policy of the Smith one-per-cent, law the court in that case limited the emergencies to those that were sudden, unexpected, and unforeseen. So, here in this case, the emergency laws that constitute an exception to the constitutional policy, the right of referendum, must be defined and applied with equal strictness.
I, call for the most careful reading of the Zangerle case. As the Miami Conservancy case absolutely settles for Ohio that this is a judicial question, so the Zangerle case absolutely settles for Ohio the question that this is not an emergency.
Both cases should have led this court to a unanimous opinion and judgment exactly contrary to the one arrived at.
I have examined and cross-examined the opinion of Judge Matthias in the Zangerle case, and the concurrences of both Judges Matthias and Jones in both the Miami Conservancy case and the Zangerle case, with a view to paralleling their former declarations with their present declarations.
I submit the foregoing to the candid and conscientious judgment of the people of Ohio.
A principle is a principle and not a convenience, not an elective thing that you can apply merely at pleasure. It should be applied equally and equitably to all similar situations, and must be applied in this case; and when so applied calls for an exactly contrary judgment to the one that is rendered.
*661 Now let us see what the majority say touching the emergency matter involved in this case.
It is somewhat strange that in this mere per curiam, which is of unusual length for such, but which divests any individual member of the majority from personal responsibility for it — it is somewhat strange, I say, that so small a portion of it as the last two pages are the only relevant thing in the opinion tending even in a remote way to sustain the judgment.
I want to begin this part of the discussion with a quotation from the majority opinion in the recent case of Pohl v. State, ante, 474, from which is quoted these words: “If under any possible state of facts the sections [of the law] would be constitutional, the court is bound to presume that such facts exist.”
This doctrine in the main is sound in the case from which it is quoted, which dealt entirely with the jurisdiction of the legislature in the exercise of its police powers. Broad as that term, is, it certainly has no application to the case at bar, because the constitution expressly and explicitly limits the legislature to a “state of facts.” The constitution itself makes it mandatory upon the legislature to put “the reasons for such necessity,” which of course must include the facts, and, much more, the conclusions therefrom, into a separate section and pass it separately upon a yea and nay vote. This is jurisdictional and the action of the legislature must stand or fall on what is within the act and not on “any possible state of facts.”
As a logical proposition it would be sufficient to *662 say that this major premise of the third section of the per curiam, dealing with the emergency portion of the Administrative Code, being in itself false and fallacious, the conclusion, the judgment of this case, must also be false and fallacious, for a conclusion cannot be stronger than the premises upon which- it is based.
Let us now examine Section 5 of the act for “the reasons for such necessity.”-
What necessity? Why the necessity for immediate preservation of the public peace, health and safety, which must have been suddenly and unexpectedly endangered or imperiled, necessitating an emergency law to. meet and relieve against an emergency in fact, to go into “immediate effect.”
I am relieved from a consideration of the entire section, composed of five or more paragraphs, which exhibit most industrious and labored effort on the part of the general assembly to state an emergency, or “the reasons for the necessity,” as expressed in the constitution, for the majority opinion itself disregards two-thirds of the section as too trifling and unmeritorious to be worthy even of consideration. They select one-third of it as the basis for sustaining the act as a valid act going into “immediate effect” and denying the people’s rights of referendum.
That one-third of Section 5, which is reviewed in the last two pages of the per curiam, as the major premise of the judgment, follows:
“According to the annual reports of the auditor of state, the balances subject to draft in the general revenue fund of the state, from which many of the *663 activities of the state government are supported, had shrunk from more than two million dollars on June 30th, 1919, to less than one million dollars on June 30th, 1920, (all of which, and more, was covered by unlapsed appropriations for the preceding fiscal year), clearly indicating the immediate necessity either for increasing the revenues of the state, or for effecting such a reorganization of the state administration as would tend to conserve the present revenues. General economic conditions make increased taxes highly undesirable at the present time * * * As a result of all the foregoing, the state service in the appointive state departments, shown by said investigations to be wasteful and inefficient, is becoming increasingly demoralized * * * The necessity of placing their functions upon a sound, economical, permanent and secure basis is great and immediate.”
Now what does the majority opinion say as to this one-third of Section 5?
The opinion says:
“The reasons assigned show a fiscal condition in our state which demands immediate relief. These impute the bankruptcy of the state if the present condition of affairs is allowed to exist. A shrinking of more than one million dollars in a single year in the general revenue fund of the state would seem to demand some immediate remedy for the peace and safety of the state; for a bankrupt state, or a grossly overtaxed state, is on the threshold of dissolution and becomes a fertile field for communism, bolshevism and anarchy. We have but to look to our neighbors to the south or *664 across the seas for a verification of this assertion. If this act results, as the legislature declares it will, in saving to the state its diminishing revenues, without further taxation, such an end would be not only a consummation devoutly to be wished, but would tend toward the preservation of the public peace and safety, and would be such an emergency law as was contemplated by the members of the constitutional convention in the enactment of Section Id of Article II.”
Well, here we'have the emergency uncovered:
1, Bankruptcy.
2. Bolshevism.
I now read Section 5 most carefully and fail to find either bankruptcy or bolshevism suggested in it. Of course the majority have construed it into Section 5, in its opinion, but that does not exactly put it in Section 5 and make it a part of Section 5, in either the legal mind or the popular mind.
What does the language quoted above say about either bankruptcy or bolshevism ?
First, as to bankruptcy. It says that the “revenue fund of the state * * * had shrunk from more than two million dollars on June 30th, 1919, to less than one million dollars on June 30th, 1920, - * * * clearly indicating the immediate necessity either for increasing the revenues of the state, or for effecting such a reorganization of the state administration as would tend to conserve the present revenues.”
Nowhere does Section 5 show the state of the “general revenue fund” at the time the law was to go into effect. It did state that one year before, *665 under war prices, it was a million dollars less than it had been one year prior to that. But this fund is always fluctuating, and' for aught that appears it might be on June 30, 1921, two millions or three millions, or abundantly sufficient to meet the demands upon it. There is nothing in Section 5 to the contrary.
I had always supposed, and Judge Matthias so holds in his opinion in the Zangerle case, that the emergency in fact, to be met by an emergency in law, must relate to an emergency existing when the law is proposed, and no such emergency is attempted to be stated.
The only emergency attempted to be stated relates to June 30, 1920, a year ago. There is no allegation here that there is no money to appropriate to pay the current expenses of the government. There is no allegation here that the administrative act will save the people a single dollar. In fact the act itself shows that the salaries of the heads of all the departments in the so-called “cabinet” under the “Administration Code” will be higher than they were under the former system. And there is no evidence in Section 5, nor even an averment in Section 5, that anybody’s salary is going to be reduced, that any expense is going to be lessened, or that there will be any actual bona fide saving to the state of Ohio. All that it says in that behalf is that it “would tend to conserve the present revenues,” a mere vague conclusion hardly sufficient as the foundation of an emergency.
So much for the fanciful and exaggerated con *666 struction of Section 5, whereby this court has read into it threatened bankruptcy. ?
In Judge Matthias’ opinion in the Zmgerle case, in which Judge Jones concurred, and all the other members of the court then on the bench, except Judge Donahue, regarding an exception to a general legislative policy, it was held that a special exception to a general legislative policy must be strictly construed.
Surely, too, a special exception to a general constitutional policy, the right of referendum, must be equally strictly construed. By a liberal rule of construction, yes, a fanciful, imaginative, exaggerated rule of construction, threatened bankruptcy and impending bolshevism are read into this Section 5 by this court.
It is hard to be patient or polite in the face of such flimsy and absurd statements by a court of last resort.
Again, the constitution placed its limitation upon the emergency law, confining it to an emergency of fact, suddenly and unexpectedly occasioned, in which the public peace, health and safety are suddenly and unexpectedly endangered, and the emergency law necessary therefor, immediately necessary, should go into “immediate effect” in order to “immediately preserve the public peace, health and safety.”
This limitation in the constitution to the “public peace, health and safety” has been by the majority extended to include public economy, public efficiency, public welfare. Judge-made law has long been *667 under just condemnation. What will be said of judge-made constitution?
Two-thirds of Section 5, purporting to state the reasons for the necessity, having been discarded by the majority opinion as so much legislative junk, I maintain that it follows from the foregoing reasons that the remaining one-third is entitled as of right to the same classification.
If, however, Section 5, taken in conjunction with the whole act, by its four corners, fairly presented an emergency law suited to immediately preserve the state in respect to its peace, health or safety, as against a sudden and unexpected situation that is immediately dangerous in the constitutional respects mentioned, then I should regard the law as one which was required to go into “immediate effect’* in order to relieve against and guard against further dangers arising from the emergency in fact.
But taking the law by its four corners and surveying the whole of it, where is there anything that may be regarded as an emergency under the decision in the Zangerle case, and the opinion of Judge Matthias therein, defining emergency and applying it to the statute then involved?
The congress of the United States has appointed a committee upon ■ reorganization of the departments, with a view of increasing the efficiency and reducing the expenses of the government, and I have no doubt that the same can be effectively done and will result in the saving of many millions of dollars annually, that the committee will so report, and will directly assure the congress of the United States and the people of the nation that such saving *668 will result from the proposed legislation. But would that constitute an emergency under our constitution? Everybody knows that this situation has been gradually growing. Just as Judge Matthias said in the Zangerle case touching roads out of repair, it is “a condition gradually created” and therefore expected and foreseen. No one administration is responsible for the whole of it. But that in no wise involves an emergency, as the law knows an emergency, as the public understands an emergency.
If, now, the next general assembly of Ohio shall be of a different political complexion, and commanding the necessary vote puts forth a new administrative bill, again reorganizing the various departments of state, abolishing the present offices, creating new ones with new titles, will that likewise constitute an emergency ? If the present “Administration Code” constitutes an emergency, succeeding legislatures will have little trouble in framing a law that will also meet the emergency provision of'the constitution as defined by the majority in this case, and we will have the state ripped fore and aft, from river to lake, from one administration to the next, and all the evils the people of Ohio have suffered from ripper legislation in the past will be renewed tenfold.
But the act itself shows that this is not an emergency by any possibility of construction. There is nothing sudden or unexpected to deal with here. At most, conditions that exist were due to negligence or indifference, or lack of proper efficiency *669 and economy in the public service, running over a period of years.
The opinion of the four judges constituting the majority concludes with these words:
“Indulging the presumption in favor of the legislation, and in the absence of positive, judicial knowledge to the contrary, this court is bound to accept as true the reasons assigned by the legislature for making the act in question an emergency law.”
This is the only ground of agreement of the four majority judges in the rendition of this judgment, and, strange to say, it is the most unsound proposition discussed or suggested in the entire opinion. No rule of law is laid down for judicial review, which exists here only in name. I maintain that the rule of review is analogous, strongly analogous, to the review of special verdicts rendered by juries in connection with general verdicts. The jury corresponds to the general assembly; the general verdict corresponds to the general law holding that it is an emergency by going into immediate effect. Section 5 is the special verdict required by the constitution.
The rule is well settled that if the special verdict is contrary to the general verdict, the special verdict controls. Why? Because it makes special findings upon express and essential questions of fact upon which the final judgment must depend. This is an old rule of law, as old as our American jurisprudence.
It is not a question of fact now, it is a question of law. Are these two verdicts, the general ver *670 diet and the special verdict, consistent with each other ? That is the question of law for this court to determine, but it is nowhere discussed in the opinion. The opinion simply says:
We are “'bound to accept as true the reasons assigned by the legislature.”
Section 5 in the first paragraph expressly shows that the general assembly did not set forth any “reasons for such necessity,”- but contented itself with this statement as to compliance with the constitution :
“The reasons for such necessity lie in facts, which two-thirds of all the members elected to each branch of the general assembly have considered, found and determined and which are separately set forth herein, as follows.”
The extent to which the majority opinion relies upon these facts has been already referred to in the majority opinion, and likewise in this dissent, but the reasoning upon those facts is neither attempted in Section 5, as required by the constitution, nor in the majority opinion.
The original form of the amendment called for “facts of necessity.” It was subsequently and significantly changed to “reasons for such necessity,” and no reasons appear in Section 5 by the most liberal interpretation.
Whether or not these facts, considered in their most favorable light, constitute “reasons for such necessity” is surely a legal question, yet the majority opinion says, we are “bound to accept as true the reasons assigned by the legislature,” when the *671 record shows the legislature assigns no reasons, but merely gives these facts.
We are not bound to accept these facts in their relation to each other, or in relation to the public state of affairs, of which we as men have common knowledge, as contradicting that common knowledge, as contradicting our common experience in both private and public business, and in the use of exact, elementary English.
What we -commonly know as men we cannot unknow as judges. That common knowledge must square with our reasoning and its results. As men, we know that in all private business and public business, there is constant need of increased efficiency and increased economy, caused by conditions covering a period of years, slowly but surely created by the very machinery by which private or public business is conducted. The need for such higher efficiency or economy is like the poor, always with us. It is in no wise “a sudden or unexpected happening; an unforeseen occurrence or condition,” as was so aptly said in the Zangerle case, supra, and so wholly forgotten in this case.
As men, we know that in the language of the people, pertaining to their various lines of business, the words “efficiency” and “economy” never have been and never can be synonymous with “emergency.” Whether or not this act will result in any higher efficiency or economy in the public service is wholly beside the question, and can only be determined after a fair, practical operation, — and such is not an emergency. The basis of an emer *672 gency created by a one-million-dollar shrinkage in a fund is hardly substantial in a state where forty millions or more are appropriated annually for the expenses of government.
What a slander upon the fair name of Ohio!
The men who believed in the right of referendum, and who wrote it in the constitution, had no such intention. It was bitterly fought by those who opposed the principle and it was denominated as one of the “Follies of 1912.” But the opponents of the referendum lost in that convention. They lost at the polls. But what they lost then, they have temporarily won in this case.
The legislature by this decision can at any time, as the agent of the people, nullify and paralyze the will of their masters in the exercise of their legislative power under the constitutional right of referendum, and we are thus presented with the glaring and absurd situation of a public agent defying the public principal, tying its hands, denying its rights, nullifying its constitution, and exercising autocratic power thereunder. Further, the Ohio general assembly, when sanctioned by the supreme court of Ohio, will exercise all the supremacy of an English parliament, and the right of referendum becomes a -nullity.
This decision undermines the public confidence in the legislature, but it undermines tenfold more the public confidence in our courts. The decision should have been unanimous in favor of the people’s right of referendum upon the peopled law. I fear this is another Dred Scott decision.